**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
In re:

                                                        Chapter 11

PRINCE FASHIONS, INC.,

                                    Debtor.              Case No. 19-23079 (LGB)
-------------------------------------------------------------X
PRINCE FASHIONS, INC.,

                                    Plaintiff,
                                                        Adv. Proc. No. 19-08714 (LGB)
v.

60G 542 BROADWAY OWNER, LLC, and
542 HOLDING CORP.,

                                    Defendants.
-------------------------------------------------------------X

## <u>MEMORANDUM OPINION</u>

## <u>APPEARANCES</u>

LOUIS FOGEL LAW
*Attorneys for Plaintiff Debtor*
5 Nottingham Road
Annandale, NJ 08801
By:     Louis Fogel

ROSEN PC
*Attorneys for Plaintiff Debtor*
747 Third Avenue
New York, NY 10017
By:     Sanford Rosen

COLE SCHOTZ P.C.
*Attorneys for Defendant 60G 542 Broadway Owner, LLC*
1325 Avenue of the Americas, 19th Floor
New York, NY 10036
By:     Nolan Shanahan
        Joseph Barbieri

BOYD RICHARDS PARKER & COLONNELLI, P.L.
*Attorneys for Defendant 542 Holding Corp.*
1500 Broadway, Suite 505
New York, NY 10036
By:    Emil Samman

**HON. LISA G. BECKERMAN**
**UNITED STATES BANKRUPTCY JUDGE**

When deciding whether to exercise its equitable powers under section 105 of the Bankruptcy Code (as defined below), the Court is mindful of what it *can* do but also considers what it *should* do.  In this Adversary Proceeding, the plaintiff-debtor Prince Fashions, Inc. (the "Plaintiff" or "Prince" or the "Debtor") is seeking to have the Court recharacterize a terminated lease of nonresidential real property under section 105 of the Bankruptcy Code, which lease was terminated prior to Prince filing for bankruptcy, and award Prince monetary damages.  *See* Amended Complaint [ECF No. 33].  Pending before the Court are cross-motions for summary judgment filed by the Plaintiff and each of the two Defendants (as defined below).

The facts of this case are unusual.  The Lease (as defined below) was terminated several years prior to Prince's Chapter 11 filing.  So, the Lease was not an "unexpired lease of nonresidential real property" at the time of Prince's Chapter 11 filing.  The Court could not find any cases where a lease terminated prior to a bankruptcy filing was recharacterized under the applicable law.  Additionally, the Second Circuit case law on recharacterization of a lease involves disputes arising in the context of sections 365(d)(3) and/or 365(d)(4) of the Bankruptcy Code, neither of which are applicable here because the Lease was terminated pre-petition.  Notwithstanding that, after applying the existing Second Circuit case law on recharacterization to the Lease, the Court finds that the Lease should not be recharacterized.

For the reasons set forth herein, the Court grants the Defendants' Motions (as defined below) in their entirety and denies the Plaintiff's Motion (as defined below) in its entirety.

2

## I.    BACKGROUND

### A.    <u>The Parties</u>

The Plaintiff is a corporation duly organized under the laws of New York state. Am. Compl. at ¶ 5. Defendant 60G 542 Broadway Owner, LLC ("Defendant 60G") is a limited liability company, authorized to conduct business in New York state. *Id.* at ¶ 9. Defendant 542 Holding Corp. ("Defendant 542 Holding," and with Defendant 60G, the "Defendants") is a cooperative housing corporation organized under the laws of New York state. *Id.* at ¶ 8.

### B.    <u>The Premises</u>

From 1980 to 2020, the Plaintiff occupied the ground floor commercial space and portions of the basement (the "Premises") of a six-story building located at 542 Broadway, New York, New York 10012 (the "Property") pursuant to the terms of the Lease. Am. Compl. at ¶ 6. The Premises are the subject of this litigation.

In April 1980, 542 Equities Associates ("542 Equities") was the record owner of the Property. Am. Compl. at ¶ 10. 542 Equities, through its sole owner, David Silverstein ("Mr. Silverstein"), engaged in a sale-leaseback transaction on April 11, 1980, transferring the Property to Defendant 542 Holding by deed. *Id.* at ¶ 20. On the same day, Defendant 542 Holding, through its sole owner at the time, also Mr. Silverstein, leased the Premises back to 542 Equities (the "Lease"). *Id.* at ¶ 24; Am. Compl., Ex. A. On April 22, 1980, 542 Equities assigned its rights under the Lease to the Plaintiff (the "Assignment"). Am. Compl. at ¶ 24. 542 Equities and the Debtor also executed a security agreement which memorialized the obligation of the Debtor to pay $40,000 to 542 Equities for the Assignment (the "Security Agreement"). ECF No. 88 at ¶ 9; ECF No. 85, Ex. C. The Security Agreement was not recorded. ECF No. 85 at 10.

In April 2015, Defendant 542 Holding filed a declaration to establish a plan for condominium ownership of the Property. ECF No. 95 at ¶ 15. This created "a two unit condominium consisting of a residential unit owned by a cooperative corporation and a commercial unit." ECF No. 94, Ex. E. In May 2015, Defendant 542 Holding executed a deed transferring the commercial unit, the Premises, to Defendant 60G. ECF No. 95 at ¶ 16. At no point, however, were shares allocated to or sold in connection with Premises. *Id.* at ¶ 19. Nor is the Lease a proprietary lease. Am. Compl, Ex. A ("Standard Form of Store Lease"); ECF No. 111 at 9. Defendant 542 Holding and Defendant 60G then entered into an Assignment and Assumption of Retail Master, under which Defendant 542 Holding's interest in the Lease was assigned to Defendant 60G. *Id.* at ¶ 18. Therefore, as of May 2015, Defendant 60G was the lessor and the Plaintiff was the lessee of the Premises.

### C. **The Lease**

The initial Lease term was 99 years and the Lease contained two 50-year renewal options. Am. Compl., Ex. A. The annual rental rate was "$7,076.46 for the first year, and 19.99% of the net expenses of the building, on an accrual basis, . . . for each subsequent year." *Id.* The Rider of Lease defined "net expenses" as "accrued expenses related to the operation of the building for a calendar year, including depreciation of capital assets." *Id.* at ¶ 43D.

Under the Lease, the tenant was prohibited from making any changes to the Premises without the landlord's written consent, and any allowed changes could neither be structural in nature nor affect the utility services, plumbing, or electrical lines of the Premises. *Id.* at ¶ 3. The Lease was "subject and subordinate to all ground or underlying leases and to all mortgages which may [have then or thereafter] affect[ed] such leases or the real property of which demised premises are a part and to all renewals, modifications, consolidations, replacements and extensions of any

4

such underlying leases and mortgages." *Id.* at ¶ 7. The tenant also agreed under the Lease "to maintain general public liability insurance in standard form in favor of [the] Landlord[1] and Tenant against claims. . . . in an amount and with carriers acceptable to the Landlord." *Id.* at ¶ 8.

The covenants, conditions, and agreements within the Lease bound and inured "to the benefit of [the] Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in [the] lease, their assigns." *Id.* at ¶ 37. The tenant was free to "assign, mortgage, or encumber [the Lease] . . . without the written consent of Landlord." *Id.* at ¶ 44.

### D. State Court Litigation

The Premises and the Lease have been subject to state court litigation for years.[2] When Defendant 60G acquired the Premises and assumed the Lease, it also assumed Defendant 542 Holding's liability in the ongoing state court litigation. ECF No. 84 at ¶¶ 25, 36; *see* ECF No. 87, Exs. K (Purchase Sale Agreement), P (Promissory Note). The litigation relevant to this Adversary Proceeding began in 2016 when Prince failed to maintain general liability insurance in favor of its landlord, Defendant 60G, as required by the Lease. ECF No. 86-2 at ¶ 11.

---

[1] The Lease defines "Landlord" as "the owner, or the mortgagee in possession, for the time being of the land and building (or the owner of a lease of the building or of the land and building) of which the demised premises form a part . . . ." *Id.* at ¶ 33.

[2] See *Prince Fashions v. 542 Holding Corp.*, No. 110089/1996 (the "1996 Action") (seeking determination as to certain provisions of the Lease); *Prince Fashions, Inc. v. 542 Holding Corp.*, No. 120149/2002 (the "2002 Action") (seeking expenses for repair of damaged property); *542 Holding v. Prince Fashions, Inc.*, No. 105673/2005 (seeking expenses for repair of damaged property); *542 Holding v. Prince Fashions*, No. 103773/2008 (regarding failure to pay rent pursuant to the Lease); *Prince Fashions, Inc. v. 60G 542 Broadway Owner, LLC*, No. 651255/2016 (the "Yellowstone Action") (seeking declaratory judgment that Prince did not breach the Lease and Yellowstone Injunction); *Prince Fashions, Inc. v. 60G 542 Broadway Owner, LLC*, No. 154461/2016 (the "Second Yellowstone Action") (seeking declaratory judgment that Prince did not breach the Lease and Yellowstone Injunction); *542 Broadway Lender LLC v. 605G 542 Broadway Owner, LLC*, No. 850017/2017 (seeking foreclosure of the Premises); *60G 542 Broadway Owner, LLC v. Prince Fashions, Inc.*, No. 160512/2018 (seeking declaratory judgment regarding lease termination and possession of the Premises).

On March 4, 2016, Defendant 60G served a Notice of Default on Prince, declaring Prince in default of the Lease.  ECF No. 86-2 at ¶ 12; ECF No. 100, Ex. F (the "Notice of Default").  On July 1, 2016, Defendant 60G served a Notice of Lease Cancellation, which effectively terminated the Lease on July 5, 2016.  ECF No. 86-2 at ¶ 13; ECF No. 100, Ex. G (the "Notice of Cancellation").

On July 11, 2016, Defendant 60G filed a petition to commence a holdover proceeding in the New York City Civil Court (the "Civil Court").  ECF No. 86-2 at ¶ 13; ECF No. 100, Ex. H (the "Petition").  Prince filed an answer to the Petition in which it asserted nine affirmative defenses.[3]  ECF No. 86-2 at ¶ 14; ECF No. 100, Ex. I (the "Holdover Answer").  Defendant 60G moved for summary judgment seeking a final judgment of possession, which was granted by the Civil Court.  ECF No. 86-2 at ¶¶ 17, 19.  The Civil Court determined that the Lease had been properly assigned to Defendant 60G and Defendant 60G was Prince's landlord in accordance with the definition of "Landlord" under the Lease.  ECF No. 86-2 at ¶ 20; ECF No. 100, Ex. J (the "Summary Judgment Order").

Prince moved to renew and reargue the Summary Judgment Order, which the Civil Court granted in part by reversing the prior award of summary judgment and reinstating several of Prince's affirmative defenses.[4]  ECF No. 86-2 at ¶¶ 21–23; ECF No. 100, Ex. K at 2– 3 (the "Renewal Order").  Notably, the Civil Court did not reinstate the second affirmative defense that challenged whether Defendant 60G was Prince's landlord.  ECF No. 86-2 at ¶ 23.  After appeal by

---

[3] The nine affirmative defenses included: (1) failure to state a cause of action, (2) lack of standing because Defendant 60G is not Prince's landlord, (3) defective notice of default, (4) the default is curable, (5) insurance policies previously provided to 542 Holding Corp. bind Defendant 60G, (6) the proper remedy was for Defendant 60G to secure its own policy and charge Prince for the premium, (7) because the Notice of Default is invalid, the Notice of Termination is of no force and effect, (8) prior pending actions require a determination of validity of the Notice of Default and Defendant 60G's claim to be Prince's landlord, and (9) the claims were not brought in good faith.

[4] The Civil Court reinstated the first, fifth, seventh, and ninth affirmative defenses.

Defendant 60G, on October 29, 2018, the Appellate Term, First Department reversed the Renewal Order. *Id.* at ¶ 24; ECF No. 100, Ex. L (the "Appellate Term Order"). This "confirmed the termination of the Lease and 60G's right to regain possession of the Premises and dismissed Prince's remaining affirmative defenses on the merits." ECF No. 86-2 at ¶ 25.

The Appellate Term Order entitled Defendant 60G to the entry of a Judgment of Possession against Prince and the issuance of a warrant of eviction based on Defendant 60G's "unrebutted showing that the tenant breached the insurance coverage requirements of the governing commercial lease agreement." *Id.* at ¶¶ 26–27. The Judgment of Possession was entered by the Civil Court on November 19, 2018. *Id.* at ¶ 29; ECF No. 100, Ex. M. The Civil Court issued a warrant of eviction, the stay of which was set to expire by its terms on January 11, 2019. ECF No. 86-2 at ¶ 29.

Before the stay expired, Prince moved to reargue in the Appellate Term, for leave to appeal to the Appellate Division, and for a stay pending such appeal. *Id.* at ¶ 30. On December 21, 2018, the Appellate Term denied Prince's motion to reargue and leave to appeal to the Appellate Division. *Id.* Prince then moved in the Appellate Division for leave to appeal the Appellate Term Order and for a stay pending the determination of its motion. *Id.* at ¶ 31. The Appellate Division stayed enforcement of the Appellate Term Order while this request was pending, but ultimately denied Prince's motion for leave to appeal and vacated the stay on May 14, 2019. *Id.* at ¶ 32; ECF No. 100, Exs. N (the "Stay Order"), O (the "Final Order"). As a result, the Appellate Term Order is a final, non-appealable judgment. *Id.*

## II.   ADVERSARY PROCEEDING

### A.  **Bankruptcy Proceeding**

The Plaintiff filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in this Court on May 29, 2019 (the "Petition Date").  *In re Prince Fashions, Inc.*, No. 19-23079 (Bankr. S.D.N.Y. 2019) ("Main Case").  On its Amended Schedule G, the Plaintiff listed an unexpired lease of the Premises to which Defendant 60G and Defendant 542 Holding were listed as counterparties.  Main Case at ECF No. 4.  In December 2019, the Court entered an order modifying the automatic stay, which permitted Defendant 60G to commence an eviction proceeding against Prince.  Main Case at ECF No. 51.  On January 10, 2020, Prince was evicted from the Premises and Defendant 60G was awarded legal possession of the Premises by the New York City Marshal.  ECF No. 86-2 at ¶ 36; ECF No. 100, Ex. P (the "Marshal's Legal Possession").

### B.  **Initial Complaint**

In the meantime, on November 22, 2019, the Plaintiff commenced this Adversary Proceeding by filing its Complaint for Declaratory Relief (the "Initial Complaint").  ECF No. 1.  On January 17, 2020, Defendant 60G moved to dismiss the Initial Complaint.  ECF No. 7.  On January 22, 2020, Defendant 542 Holding filed its Answer to the Initial Complaint.  ECF No. 12.  On July 15, 2020, the Court entered an Order on Defendant 60G's Motion to Dismiss the Initial Complaint in which it granted the Plaintiff 45 days to file a motion for leave to file an amended complaint.  ECF No. 24.

### C.  **Amended Complaint**

On August 28, 2020, the Plaintiff filed its Motion for Leave to Amend the Adversary Complaint (the "Motion for Leave"), which the Court granted on October 29, 2020.  ECF Nos. 26, 32.  On October 30, 2020, the Plaintiff filed its Amended Complaint.  ECF No. 33.

### D.  **Motions to Dismiss and Answers**

On December 10, 2020, Defendant 542 Holding filed its Amended Answer to the Amended Complaint.  ECF No. 37.  On January 11, 2021, Defendant 60G filed a Motion to Dismiss the Amended Complaint ("60G Motion to Dismiss").  ECF Nos. 41, 42.  On March 1, 2021, Defendant 542 Holding filed a Motion to Dismiss the Amended Complaint ("542 Holding Motion to Dismiss," and together with the 60G Motion to Dismiss, the "Defendants' Motions to Dismiss").  ECF No. 44.  On September 21, 2021, the Court denied the Defendants' Motions to Dismiss.  ECF No. 54.  Thereafter, on October 4, 2021, Defendant 60G filed its Answer to the Amended Complaint.  ECF No. 55.

### E.  **Scheduling Orders**

On January 14, 2022, the Court entered a Scheduling and Pre-Trial Order setting deadlines for fact and expert discovery and scheduling the final pre-trial conference, which was amended several times through stipulations and subsequent scheduling orders due to outstanding discovery issues.  ECF Nos. 58, 60, 63, 64, 65, 70, 71, 73, 77.  On January 17, 2024, the Court entered a Scheduling Order for Motions for Summary Judgment.  ECF No. 79.  Upon Defendant 542 Holding's request, an Amended Scheduling Order was entered on March 12, 2024, extending the briefing time with respect to Defendant 542 Holding's Motion for Summary Judgment.  ECF No. 90.

**F.  Motions for Summary Judgment**

On March 11, 2024, the Plaintiff filed its Notice of Motion for Summary Judgment [ECF No. 83], Statement of Undisputed Facts [ECF No. 84], Affidavits of Doron Zabari and Louis Fogel in Support of its Motion [ECF Nos. 85, 87], and Memorandum of Law in Support of its Motion ("Plaintiff's Motion") [ECF No. 88].  On the same date, Defendant 60G filed its Motion for Summary Judgment ("Defendant 60G Motion") and Statement of Undisputed Facts [ECF No. 86], and subsequently filed Declarations of Bastien Broda and Nolan Shanahan in Support of its Motion [ECF Nos. 99, 100].

On March 18, 2024, Defendant 542 Holding filed its Motion for Summary Judgment ("Defendant 542 Holding Motion," and together with the Defendant 60G Motion, the "Defendants' Motions") [ECF No. 96], Statement of Undisputed Facts [ECF No. 95], and Affidavit of Sophia Mokotoff in Support of its Motion [ECF No. 94].

**G.  Responses**

On April 10, 2024, the Plaintiff filed its Response to Defendant 60G's Statement of Undisputed Facts [ECF No. 104], Declaration of Doron Zabari in Opposition to the Defendant 60G Motion [ECF No. 105], and Memorandum of Law in Opposition to the Defendant 60G Motion [ECF No. 106].

On the same date, Defendant 60G filed its Opposition to the Plaintiff's Motion [ECF No. 97] and Response to the Plaintiff's Statement of Undisputed Facts [ECF No. 98].  Defendant 542 Holding filed its Opposition to the Plaintiff's Motion [ECF No. 103], its Counter-Rule Statement in Response to the Plaintiff's Statement of Undisputed Facts [ECF No. 102], and the Affidavit of Sophia Mokotoff in Opposition to the Plaintiff's Motion [ECF No. 101].

On April 17, 2024, the Plaintiff filed a Response to Defendant 542 Holding's Statement of Undisputed Facts [ECF No. 107] and Memorandum of Law in Opposition to the Defendant 542 Holding Motion [ECF No. 108].

### H. <u>Replies</u>

On April 26, 2024, the Plaintiff and Defendant 60G each filed a Reply Memorandum in Further Support of their respective Motions [ECF Nos. 109, 110].  On May 3, 2024, Defendant 542 Holding filed its Memorandum of Law in Further Support of its Motion [ECF No. 111].

### I. <u>Hearing</u>

On May 15, 2024, the Court heard oral argument on the three motions for summary judgment (the "Hearing").  The Hearing was conducted in hybrid format, at which counsel for the Plaintiff appeared remotely and counsel for the Defendants appeared in person.

## III.   STANDARD OF REVIEW

### A. <u>Summary Judgment</u>

Bankruptcy Rule 7056 incorporates Rule 56 of the Federal Rules of Civil Procedure, which states that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "bears the burden of establishing that no genuine issue of material fact exists" and that the undisputed facts entitle the movant to judgment as a matter of law.  *Morales v. Holder*, 351 F. App'x 554, 555 (2d Cir. 2009) (*quoting Rodriguez v. City of N.Y.*, 72 F.3d 1051, 1060–61 (2d Cir. 1995)).

If the movant satisfies this burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial to avoid summary judgment."

*Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (citation and internal quotation marks omitted).  "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and rather must establish the existence of a genuine issue of fact by "citing to particular parts of materials in the record."  *Ning Yen Yao v. Kao (In re Kao)*, 612 B.R. 272, 280 (Bankr. S.D.N.Y. 2020) (*quoting Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010); Fed. R. Civ. P. 56(a)) (internal quotation marks and citation omitted).  If, however, "the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

In determining whether a genuine issue of material fact exists, the court must draw all factual inferences in the light most favorable to the nonmoving party.  *Rodriguez*, 72 F.3d at 1061 (citations and internal quotation marks omitted).  If "there is any evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper."  *Id.* (citing *Brady v. Town of Colchester*, 863 F.2d 205, 210–11 (2d Cir. 1988)).  A grant of summary judgment will only be precluded by "disputes over facts that might affect the outcome of the suit under the governing law."  *In re Kao*, 612 B.R. at 280 (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In reviewing the available evidence, the court cannot "weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact."  *Rodriguez*, 72 F.3d at 1061 (citations omitted).

### B.  <u>Recharacterization Claim</u>

There is a "strong presumption that a deed and a lease are what they purport to be."  *Barney's, Inc. v. Isetan Co.*, 206 B.R. 328, 333 (Bankr. S.D.N.Y. 1997).  The burden of proof with

a recharacterization claim rests with "the party seeking to characterize the Agreement as something 'other than what it purports to be.'" *In re WorldCom, Inc.*, 339 B.R. 56, 62 (Bankr. S.D.N.Y. 2006) (resolving cross-motions for summary judgment) (citing *In re Owen*, 221 B.R. 56, 60 (Bankr. N.D.N.Y. 1998)).  Because Prince is asking the Court to recharacterize the Lease as a transfer of ownership, in order to succeed on a motion for summary judgment, Prince must satisfy its burden of proof at trial.  *In re WorldCom, Inc.*, 339 B.R. at 62 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  "The quantum of evidence necessary to satisfy that burden is 'substantial.'"  *Barney's*, 206 B.R. at 332 (citing *In re PCH Assocs.*, 804 F.2d 193, 201 (2d Cir. 1986)).

The Defendants do not bear the burden of proof at trial and may "satisfy [their] burden[s] of production as movant[s] by simply showing that little or no evidence may be found to support [Prince's] claim." *In re WorldCom, Inc.*, 339 B.R. at 62.  "If [the Defendants] carr[y] this initial burden of production, [Prince] must set forth specific facts to show triable issues of fact exist."  *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 57, 586–58 (1986)).

## IV.  DISCUSSION

### A.  <u>This Court's Prior Findings</u>

The Court is mindful of Judge Drain's prior findings in the context of the Defendants' Motions to Dismiss.  Judge Drain held that the Initial Complaint should not be dismissed under the Rooker-Feldman doctrine under Federal Rule of Civil Procedure 12(b)(1).  ECF No. 87-1 at 30–37.  Judge Drain found that the basis for the relief requested in the Initial Complaint, recharacterization of the Lease, is based on federal law and could not have been decided by the state court.  *Id.*  Additionally, the Plaintiff in the Initial Complaint did not complain of injuries caused by a state court judgment.  *Id.*

Judge Drain also denied dismissal of the Initial Complaint on res judicata and collateral estoppel grounds. *Id.* at 39–45. Judge Drain held that the state courts' various decisions regarding enforcement of the Lease and the eviction of the Debtor did not previously address the recharacterization issue. *Id.* Accordingly, the Court does not revisit those issues in the context of the cross-motions for summary judgment filed by the Plaintiff and the Defendants.

### B. <u>Recharacterization Concerns</u>

The Court was unable to locate any precedent, whether in the Second Circuit or elsewhere, wherein a lease was recharacterized as an ownership interest under federal law when the lease had been terminated prior to the debtor's bankruptcy filing under applicable state law. The Court asked counsel for the Plaintiff about this at the Hearing, to which Plaintiff's counsel acknowledged that he had not found any such cases either. ECF No. 116 at 26:4–12.

The Court suspects that no other bankruptcy courts have been asked post-petition to recharacterize a lease that had been terminated pre-petition under applicable state law. This may have to do with the nature of recharacterization and when such a claim is typically raised in a bankruptcy proceeding. Most recharacterization disputes involving a lease of nonresidential real property, the type of lease at issue here, originate in the context of section 365(d)(3) and/or section 365(d)(4). Under section 365(d)(3), if a debtor does not perform its obligations under the lease post-petition, then the debtor or the landlord may seek relief from the bankruptcy court. *See In re PCH Assocs.*, 804 F.2d 193 (2d. Cir. 1986). Alternatively, under section 365(d)(4), if the deadline to assume or reject leases of nonresidential real property passes or is about to pass, then a debtor or landlord may seek relief from the bankruptcy court. *See Int'l Trade Admin. v. Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991). In both instances, the issue of whether a lease is a "true" lease is raised.

Since the Lease was terminated pre-petition as of July 5, 2016, the Lease is not "an unexpired lease of nonresidential real property" nor was it one as of commencement of the bankruptcy. Thus, both sections 365(d)(3) and 365(d)(4) are inapplicable to the Lease. This is relevant to the Court because all of the case law that the Court was able to locate regarding recharacterization of leases under federal law involved a determination of whether a lease was a "true" lease and thus, whether section 365(d)(3) and/or section 365(d)(4) applies to the lease. The courts in such cases did not rely solely on section 105 of the Bankruptcy Code as the basis for granting relief, but instead applied section 365(d)(3) and/or section 365(d)(4).

In *Law v. Siegel*, the Supreme Court confirmed that "'whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of' the Bankruptcy Code." 571 U.S. 415, 421 (2014) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)). In light of this decision, the Court questions whether it has the equitable power to recharacterize a lease where sections 365(d)(3) or 365(d)(4) do not apply. And even if such equitable power to recharacterize a terminated lease under section 105 exists, the Court further questions whether it should be exercised here.

The New York State Supreme Court ruled that Prince's Lease default was incurable. ECF No. 100, Ex. L at 3. On July 1, 2016, Defendant 60G, as landlord, served a Notice of Lease Cancellation on Prince. ECF No. 86-2 at ¶ 12; ECF No. 100, Ex. G. This terminated the Lease as of July 5, 2016. *Id.* The Appellate Term Order found that 60G "had valid grounds for terminating [the] commercial lease, based upon [Prince's] incurable default in obtaining insurance naming the landlord as an additional insured." ECF No. 100, Ex. L at 5.

It is clear that bankruptcy courts cannot revive terminated leases. Section 541(b)(2) excludes nonresidential real property leases from being property of the estate if the lease has

terminated at the expiration of its stated term before commencement of the bankruptcy proceeding; if a lease was terminated pre-petition, the bankruptcy court has no authority over it. *See In re Memphis-Friday's Assocs.*, 88 B.R. 830 (Bankr. W.D. Tenn. 1988). "It is equally clear that the bankruptcy court cannot resurrect a lease terminated prior to the filing of the petition." *In re Darwin*, 22 B.R. 259, 263 (Bankr. E.D.N.Y. 1982) (citing *In re Youngs*, 7 B.R. 69, 71 (Bankr. D. Mass. 1980)). While the Plaintiff's request here is being made in a different context, this precedent may preclude the Court from exercising its equitable powers to recharacterize a terminated lease.

Even if its equitable powers under section 105 permit this Court to grant the relief requested, the Court questions whether it should do so. The precedent could encourage commercial tenants whose leases were terminated pre-petition and were subsequently evicted to file for bankruptcy with the hope of successfully recharacterizing their terminated leases and receiving monetary damages from their landlords.

To grant the relief requested in the Amended Complaint, the Debtor is asking the Court to find an ownership interest under a lease agreement where all parties, including the Debtor, acknowledge that Prince's right to possession of the real property has been terminated. "[Mr. Fogel:] So our position is that certain ownership - - that ownership rights were granted under the lease at the time that it was made. And so terminating the possession of the lease does not preclude a claim for recharacterization of an ownership interest going back to 1980." ECF No. 116 at 29:9–13. The Court is concerned about how that would be possible since the Debtor is essentially asking the Court to parse the Lease to remove the rights of possession, as those were clearly terminated in the state court process, but still find that Prince has an ownership interest in the real property based on the language of the Lease. "[The Court:] You are basically telling me that I have to parse the lease to take out the rights of possession, because those were terminated in the proceeding.

And you don't disagree with that. But the rest, somehow the rest, whatever the rest is of the lease gives you ownership rights even though you don't have the right of possession. Is that correct? Mr. Fogel: That's correct, Your Honor. We believe that the lease granted ownership rights in 1980, and the state court did not, cannot, did not do anything to change that." *Id.* at 29:16–25.  Since a debtor may only assume or reject all of the terms of a contract or lease and may not selectively choose among provisions of the agreement, the Court questions whether it can parse a terminated lease by removing the possessory rights and finding an enforceable ownership interest without the right of possession, but with the right of damages from its landlord or owner of record of the real property.  *In re Texaco Inc.*, 254 B.R. 536, 550 (Bankr. S.D.N.Y. 2000) ("The law is clear that a debtor who assumes a lease or other executory contract assumes the contract <u>cum onere</u>, without any diminution in its obligations or impairment of the rights of the lessor in the present or the future.") (citing cases).

For the reasons set forth above, the Court questions whether it has the authority to recharacterize the Lease solely based upon its equitable powers under section 105.  And if it does have the authority to recharacterize the Lease under its equitable powers, the Court questions whether it should do so.  Nevertheless, the Court will apply the "economic substance test" under Second Circuit case law to determine whether the Debtor has proven, by a preponderance of the evidence, that the Lease is not a "true" lease and should be recharacterized.

### C.  <u>Economic Substance Test</u>

The recharacterization claim fails under the "economic substance test."  This test requires "'look[ing] to the economic realities of the lease and not to the labels applied by the parties' to determine the true nature of the transaction."  *In re PCH Assocs.*, 804 F.2d 193, 197–98 (2d Cir. 1986) (quoting *Sun Oil Co. v. Comm'r*, 562 F.2d 258, 263 (3d Cir. 1977)); *Int'l Trade Admin. v.*

*Rensselaer Polytechnic Inst.*, 936 F.2d 744 (2d Cir. 1991) ("*RPI*") ("The use of terms such as 'lease' or 'landlord' and 'tenant' does not automatically transform an agreement into a bona fide lease for the purposes of [section 365(d)(4)]; rather, a court must look to 'the economic substance of the transaction and not its form.'") (quoting *In re PCH Assocs.*, 804 F.2d at 200). A court must analyze whether "the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *In re PCH Assocs.*, 804 F.2d at 199.

The Second Circuit employs the factors discussed in *In re PCH Associates*: (1) whether the "rental" payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment; (2) whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction; (3) whether the property was purchased by the lessor specifically for the lessee's use; (4) whether the transaction was structured as a lease to secure certain tax advantages; (5) whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance; and (6) whether the lessee can acquire the property at the expiration of the lease term for nominal consideration. *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency*, 155 B.R. 824, 838 (Bankr. N.D.N.Y. 1993) (citing *In re PCH Assocs.*, 804 F.2d at 200–01; *In re Wingspread Corp.*, 116 B.R. 915, 923 (Bankr. S.D.N.Y. 1990)). The *PCH* factors are not exhaustive. Other indications "that a lease is a financing vehicle include: (i) an option price bearing little resemblance to fair market value; (ii) an option price that is minima in comparison with total payments; and (iii) rental payments equal to or greater than the selling price." *In re Wingspread Corp.*, 116 B.R. at 923 (citation omitted).

In *In re PCH Associates*, "the court found that there was 'substantial evidence' pertaining to the 'circumstances of the negotiations and the economic substance of the transactions' upon which the bankruptcy and district courts could rely to find that the transaction between [the parties] was something other than a true lease." *Barney's*, 206 B.R. at 328 (citing *In re PCH Assocs.*, 804 F.2d at 200). For context, PCH sold the premises at issue to Purchase Estates, and Purchase Estates immediately leased the premises back to PCH. *In re PCH Assocs.*, 804 F.2d at 194–195. Purchase Estates then assigned its interest in the land and the lease to Liona. *Id.* at 195.

The Second Circuit determined that "[t]he transaction was structured as a ground lease to accomplish a trade-off between tax benefits for PCH [the lessee] and a higher guaranteed return, without management concerns, for Liona [the lessor]. Therefore, rent was not calculated to compensate Liona for the [lessee's] use of the property; rather the parties structured the 'rent' solely to ensure Liona's return on its investment. Furthermore, the 'purchase price' paid by Liona for the land was not based on market rate, but was calculated as the amount necessary to finance the transaction." *In re PCH Assocs.*, 804 F.2d at 199. In viewing the transaction as a whole, the Second Circuit found that the underlying agreements did not constitute a "true" lease subject to the provisions of sections 365(d)(3) or 365(d)(4). *Id.* at 200 (declining to discuss whether the contracts created a joint venture, security agreement, or some other form of investment vehicle).

In *In re Wingspread Corporation*, the leases at issue covered "manufacturing and distribution facilities acquired and built with funds provided by the sale of municipal industrial revenue bonds." 116 B.R. at 918. Ultimately, the court found a secured financing to be "couched in the language of leases." *Id.* at 923 (analyzing the lease to determine if section 365 of the Bankruptcy Code applied). The challenged leases "expressly provide[d] that the projects will be acquired for the lessee and, if the bond proceeds are insufficient, at the expense of the lessee for

the shortfall." *Id.* at 922. The lessee was also "responsible for all taxes, assessments and other charges" and rental payments would "not cease if the projects [were] destroyed or seized by eminent domain." *Id.* Further, despite title remaining with the lessor, the lessee could "grant any easements, licenses or rights of way they choose" and the lessors were "prohibited from selling, conveying, mortgaging, encumbering or otherwise disposing of any part of the projects" unless the proceeds were used to pay down the lessee's bonds. *Id.* at 923. Upon payment of the bonds, the lessee could purchase one project (worth over $2 million) for $1.00 and the other project (worth over $1.1 million) for $500.00, to which the lessors would provide the deed of conveyance in exchange. *Id.* The *Wingspread* court ultimately determined "that the leases were in fact financing agreements" rather than "true" leases. *Id.* at 923–24.

In *RPI*, which is relied upon by the Plaintiff, the Second Circuit found the lease at issue was not a "true" lease and therefore, was out of the purview of section 364(d)(4). Primarily guiding the court's decision were the two unusual aspects of the lease: "the 99 year term and the pre-paid rent." 936 F.2d at 749. The court explained that "[a]lthough an unusually long term, standing alone, does not automatically signal that an agreement is not a true lease . . . . the lengthy term is combined with the unusual pre-paid nature of the agreement." *Id.* at 749–50 (explaining that because the tenant paid the rent within the first three years of a 99-year lease, there were "no continuing payments such as would characterize a normal lease"). Other indicia of ownership in the lessee included the lessee's payment of property taxes. *Id.* at 750. Therefore, the pre-paid nature of the lease, the lengthy term, and allocation of responsibilities between landlord and tenant allowed the court to conclude "that 'the economic substance' of this transaction was closer to a sale for a term of years than to a lease." *Id.* at 751.

In Count I of the Amended Complaint, the Plaintiff contends that the transfer of ownership interest in the Premises is memorialized by the Prince Transfer Documents, defined therein to include the Lease, the Assignment, and the Security Agreement. Am. Compl. at ¶¶ 24–25, 68. At the Hearing, the Court determined that the Assignment and Security Agreement are not documents it must analyze under the economic substance test, since neither were in existence at the time the Lease was executed and therefore are not relevant. ECF No. 116 at 17:24–19:11.

Under applicable case law, the Plaintiff carries a substantial burden to recharacterize the Lease. The Court applies the *PCH* factors to the Lease as follows:

> i.    **Factor One**: Whether the rental payments were calculated to compensate the lessor for the use of the land, or rather were structured for some other purpose, such as to ensure a particular return on an investment

Pursuant to the Lease, the rental payments after the first year were fixed at "19.99% of the net expenses of the building" each month. Am. Compl., Ex. A. The Plaintiff's position on this factor is inconsistent. The Amended Complaint contends that "because of the 80/20 Rule, the rent due under the Lease necessarily was capped at 19.99% of the corporation's net operating expenses," and "[a]ccordingly, the Lease was designed to satisfy the 80/20 Rule."[5] Am. Compl. ¶ 50–53. In Plaintiff's Motion, however, the Plaintiff asserts that the Lease was "clearly not calculated to compensate and profit the lessor" and was instead "designed for the obvious purpose of passing through to the lessee the agreed percentage of the Building's expenses attributable to Prince's Space – without regard to profit." ECF No. 88 at 13. At the Hearing, counsel for the

---

[5] "Prior to 2007, in order to qualify as a 'cooperative housing corporation' under section 216 of the Internal Revenue Code, at least 80% of the corporation's gross income must derive from 'tenant-stockholders' and thus, no more than 20% of the corporation's gross income could derive from operating a trade or business or from a commercial lease." Am. Compl. at 9 (citing 26 U.S.C. § 216(b)(1)-(2)).

Plaintiff argued that "rent was structured under the Lease to profit the lessee."  ECF No. 116 at 8:17–18.

Defendant 60G suggests that the rent, set as a percentage of the building's expenses, simply compensated the landlord for Prince's use of the Premises.  ECF No. 86 at 17.  Neither party supports its position with expert evidence or testimony of a party with personal knowledge of the negotiations regarding and documentation of the Lease.  Due to the lack of evidentiary support, the Court is unable to determine the validity of any of the Plaintiff's proposed reasons as to why the rent was calculated as such.  Accordingly, the Court finds that this factor does not weigh in favor of the Plaintiff.

     ii.    **Factor Two**: Whether the purchase price was related to the fair market value of the land, or whether it was calculated as the amount necessary to finance the transaction

The Plaintiff suggests that "it is undisputed that the 'rent' under the Lease is substantially below market."  ECF No. 88 at 17.  However, the only assessment of the fair market value of the Premises available to the Court is the one conducted in July 2016.  *Id.*  As Defendant 60G correctly contends, the relevant time for considering the fair market value of the Premises is 1980, when the Lease was executed.  ECF No. 116 at 46:8–10 (Mr. Barbiere: "With regard to the rent, there's no evidence in this record that the rent in 1980 that [] the tenant was paying was under market.").  Because the record lacks any evidence as to the fair market value of the Premises in 1980, the Court finds that this factor does not weigh in favor of the Plaintiff.

     iii.    **Factor Three**: Whether the property was purchased by the lessor specifically for the lessee's use

There is no evidence as to this factor either.  Defendant 542 Holding suggests, without corroboration of its position, that the Lease was a "sweetheart" lease created in connection with

the co-op conversion and for the co-op sponsor/lessor's own benefit, while providing favorable terms for the tenant.  ECF No. 96 at 6; ECF No. 116 at 51:16–52:22.  The Plaintiff contends, in a conclusory fashion, that the sale-leaseback transaction was intended to "convert the Building to a cooperative so as to realize the value of the residential portion through the purchases of shares, and to sell the commercial portion to the Debtor."  Am. Compl. ¶ 29.  It also alleges 542 Holding and 542 Equities are alter ego entities, intended to act as vehicles for the transaction.  *Id.* at 28–29.  These arguments are unavailing.  There is no testimony from any of the parties involved in the sale-leaseback transaction to indicate the intent behind the transaction.  In contrast to the clear intent to purchase the property for the lessee's benefit in the *Wingspread* lease, the Plaintiff's unsupported statements here preclude this factor from weighing in its favor.

> iv.  **Factor Four**: Whether the transaction was structured as a lease to secure certain tax advantages

There is no evidence put forth by either party indicating whether the structure of the Lease was intended to provide tax advantages.  This factor does not weigh in favor of the Plaintiff.

> v.  **Factor Five**: Whether the lessee assumed many of the obligations normally associated with outright ownership, including the responsibility for paying property taxes and insurance

In response to the Court's question of how the Lease satisfies the *PCH* factors with respect to recharacterization, Plaintiff's counsel stated that "this Lease provides rights and obligations that are not typically found in the landlord-tenant relationship."  ECF No. 116 at 31:8–15.  As noted above, the lessee's rent set at 19.99% of the net operating expenses covers a percentage of the monthly maintenance of the premises, which includes "expenses related to the operation of the building for a calendar year, including depreciation of capital assets."  Am. Compl., Ex. A at ¶

43D.  The Plaintiff contends that by paying "19.99% of the ownership carrying costs attributable to Prince's Space," it paid "expenses usually associated with ownership."  ECF No. 88 at 15.

The Plaintiff incorrectly asserts that this rent includes payment of taxes and insurance.  *See* ECF No. 88 at 15; ECF No. 116 at 8:22–9:3; ECF No. 98 at ¶ 23 ("Denied as the evidence cited, namely paragraphs 42 and 43.A of the Lease, make no mention of taxes or insurance.").  Mr. Zabari acknowledged in his deposition that the Lease does not deem the tenant responsible for paying real estate taxes.  *See* ECF No. 86, Ex. R at 39:24–40:6.  However, it is true that the tenant was required to maintain liability insurance at its own cost and expense.  Am. Compl., Ex. A at ¶ 8.

Defendant 60G attempts to rebut such argument by asserting that "[i]t is undisputed that the Lease is not a triple net lease."  ECF No. 86 at 18.  The Plaintiff correctly recognizes that "the test is not whether the Lease is a triple net lease; it is whether [the Lease] grants rights and/or imposes obligations normally associated with ownership."  ECF No. 106 at 12.  Furthermore, a triple net lease does not conclusively establish that a lease is not a "true" lease.  *In re Integrated Health Servs.*, 260 B.R. 71, 77 (Bankr. D. Del. 2001) (stating that a triple net lease is "not an unusual term in a true lease").  However, to the extent that Prince purports that the Lease is effectively a triple net lease, it fails to provide evidence of the same.  *See* ECF No. 116 at 9:7–13 (Mr. Fogel: "[The Lease] is a triple net lease in effect . . . .").

The Court is restricted to the Lease's definition of "net operating expenses."  To the extent the Plaintiff was responsible for maintaining insurance on the Premises, this factor may weigh marginally in favor of the Plaintiff.  However, the Court finds that the Plaintiff did not assume "many" of the obligations typically associated with ownership, including the payment of real estate taxes.

vi.  **Factor Six**: Whether the lessee can acquire the property at the expiration of the lease term for nominal consideration

The Lease does not contain a purchase option on behalf of the lessee at the end of the lease term.  Even though the length of the Lease is long—initial term of 99 years plus two 50-year renewal options—there is no purchase option or transfer of ownership rights to the lessee at the end of the lease term.  Unlike *RPI,* this lengthy term is not persuasive here because the Lease lacks additional unusual factors that would indicate that the transaction is more akin to a transfer of ownership rights.  Absent a purchase option in the Lease or any documents memorializing an actual transfer of the Premises to Prince, this factor does not weigh in favor of the Plaintiff.

vii.  Lack of Expert Evidence or Personal Knowledge

As demonstrated above, the Court's difficulty in applying the *PCH* factors to the Lease is due to the lack of evidence, particularly expert testimony and personal knowledge, surrounding the sale-leaseback transaction as it occurred on April 11, 1980.

The evidentiary record of many cases on recharacterization include expert testimony on the commonality of the particular lease provisions as well as an analysis of the overall structure of the particular lease in question.  *See Barney's*, 206 B.R. at 335 (discussing the defendant's affidavit written by an expert in real estate and appraisal consultant who opined that various terms in the agreements were not uncommon in retail lease transactions); *In re LATAM Airlines Grp. S.A.*, No. 20-11254, 2022 Bankr. LEXIS 248, at *71–72 (Bankr. S.D.N.Y. Jan. 28, 2022) (discussing the potential success of a recharacterization claim and comparing expert testimony provided by opposing parties).  "*PCH Associates* was resolved after a three day trial on the merits, including extensive expert testimony, in which the court admitted parol evidence on the parties' intention in entering into the underlying transactions."  *Barney's*, 206 B.R. at 336.  Here, none of the parties

have submitted expert affidavits to support their claims. Expert testimony would have been particularly helpful as to a determination of the fair market value of the Premises in 1980 and to address the commonality of the provisions in and structure of the Lease, which the parties refer to as a "sweetheart" lease.

The testimony of Doron Zabari, as principal of the Plaintiff-Debtor, is also ineffectual. *See* ECF No. 85; ECF No. 86, Ex. R. Mr. Zabari only became associated with Prince in 1995, yet the Lease was executed in 1980, making it impossible for him to have personal knowledge as to the circumstances surrounding the Lease execution.[6] *See id.* at ¶ 8; ECF No. 86, Ex. R at 20:20–22; ECF No. 116 at 21.

For example, Mr. Zabari stated: "Based on my due diligence at that time, Prince's current owners acquired Prince in 1995 with the understanding that the Lease represented ownership of Prince's Space" and that "Prince's original owners confirmed that under their agreement with David Silverstein . . . the April 11, 1980 Lease between 542 Holding and 542 Equities Associates . . . represented a sale of Prince's Space to 542 Equities." ECF No. 85 at ¶ 6. However, the Court has not been provided with any supporting documentation for such agreement or why Prince's original owners believed the Lease constituted a transfer of ownership rights and therefore, this testimony is not persuasive.

In the deposition conducted by Defendant 60G, Mr. Zabari stated that he did not know why the sale-leaseback transaction did not include a transfer to Prince directly, and instead was executed by Mr. Silverstein's two entities, 542 Holding and 542 Equities. ECF No. 86, Ex. R at 60:6–18, 61:4–13; ECF No. 116 at 36:11–37:1. He likewise stated that he did not "know why there was [a] gap of [eleven] days between the execution of the lease and the execution of the

---

[6] The Court notes that the only party still alive with personal knowledge of the Lease execution is Mr. Silverstein, and he was not deposed by the Plaintiff.

[A]ssignment[.]"  ECF No. 86, Ex. R at 44:6–16.  The testimony of Doron Zabari provides nothing

more than unsupported, conclusory statements as to the intent or understanding of parties at the

time of the Lease execution.  ECF No. 116 at 37:2–4 (Mr. Barbieri: "So the debtor is coming before

this Court with a complaint that lays out a litany of allegations that are predicated on the intent of

parties who are not here.").   Without supporting documentation as to the parties' intent or

testimony of a party with personal knowledge of the circumstances surrounding the execution of

the Lease, Prince cannot show that triable issues of fact exist.[7]

     viii.   <u>Other Indicia of Ownership</u>

In further argument, the Plaintiff contends that there are other indicia of ownership in the

lessee provided for under the Lease.  This includes (i) the lessee's right to use the Premises "for

any lawful purpose," (ii) the lessee's right to sublease, assign, mortgage and encumber the

Premises without the lessor's consent, (iii) the rights under the Lease being conferred upon the

lessee's heirs, distributees, executors, administrators, legal representatives, successors and assigns

with unfettered freedom to exercise such rights, and (iv) that the Lease does not require the lessee

to comply with the lessor's Rules and Regulations.  ECF No. 88 at 16.  Defendant 60G proposes

that other provisions of the Lease are inconsistent with indicia of ownership.  Specifically, it points

to Section 3, providing that the tenant shall not make changes in or to the Premises without the

Landlord's prior written consent, and Section 7, providing that the Lease is subordinate to all

ground or underlying leases or mortgages.  ECF No. 116 at 42:4–15.  The Court is not persuaded,

---

[7] The Court notes that it asked counsel for Defendant 542 Holding about the declarations of Sophia Mokotoff at the Hearing.  *See* ECF Nos. 94, 101.  Ms. Mokotoff is a board member of Defendant 542 Holding and, through review of corporate documents, she stated that she is familiar with the landlord-tenant relationship that existed between Defendant 542 Holding and the Plaintiff prior to Defendant 542 Holding's assignment to Defendant 60G.  ECF No. 94 at ¶¶ 1–2.  Although counsel for Defendant 542 Holding represented at the Hearing that Ms. Mokotoff was active in the company in 1980, she was not involved with the negotiation of the Lease.  ECF No. 116 at 53:1–55:17.  The Court is not inclined to afford the declarations of Ms. Mokotoff any weight here either.

especially in the absence of affirmative expert testimony, that the provisions highlighted by the Plaintiff "impose[] obligations and confer[] rights significantly different from those arising from the ordinary landlord/tenant relationship." *Id.*

Overall, the only *PCH* factor that may support Prince's argument is Factor Five (that the Lease confers obligations typically associated with ownership on the lessee) to the extent that the lessee was required to maintain insurance on the Premises.   Regardless, this support is insignificant.  The remaining *PCH* factors, overall economic realities of the transaction, and lack of expert evidence or personal knowledge of the circumstances surrounding the Lease execution cannot support a finding that the Lease should be recharacterized as a transfer of ownership interest.  In consideration of this evidentiary void, Prince fails to provide the "substantial" quantum of evidence needed to meet its burden, and likewise fails to establish that triable issues of fact exist to defeat the Defendants' Motions.[8]  *See Barney's*, 206 B.R. at 336 (denying the debtor's motion for summary judgment to recharacterize a lease where Judge Garrity could not conclude that "based solely on the documentary evidence submitted . . . that the [relevant leases were] not 'true' leases").  Consequently, the Court need not reach the issue of whether Defendant 60G was a bona fide purchaser.

---

[8] It is helpful to look at the *In re WorldCom* case in which Chief Judge Glenn assessed cross-motions for summary judgment on a recharacterization issue.   339 B.R. at 70.   There, he found that the movant (Plaintiff WorldCom) did not satisfy its burden of proof that the lease should be recharacterized as a security interest.  *Id.* However, he denied the cross-movant's (Defendant GE) motion for summary judgment for failure to introduce evidence of the parties' expectations and failure to argue that no evidence may be offered to support WorldCom's position.  *Id.*  Chief Judge Glenn permitted this case to move to trial and gave WorldCom the opportunity to introduce evidence that conforms to the evidentiary standard.  *Id.*  Such an outcome is distinguishable because the Defendants here have provided evidence (i.e. state court judgments terminating the Lease) that is uncontroverted by the evidence put forth by Prince, which the Court finds is sufficient to grant their Motions.

### D.  **Plaintiff's Inconsistency in its Characterization of the Lease**

On a separate and final note, the Court addresses the arguments put forth concerning characterization of the Lease in prior state court filings.  The Defendants contend that the Plaintiff is raising its ownership interest argument for the first time.  ECF No. 86 at 9 ("It was in this adversary proceeding that Prince unveiled, for the first time ever, its half-baked claim of ownership.").  In response, the Plaintiff refers to two affidavits and two memoranda of law submitted in the 1996 Action to suggest that the Defendants previously agreed that the Plaintiff effectively held an ownership interest.[9]  *See* ECF No. 105.

First, the Plaintiff quotes an affidavit of Doron Zabari which stated that "[g]iven plaintiffs' 200-year lease, plaintiffs' interests in the Premises is that of an owner of the space rather than a tenant."  ECF No. 105, Ex. U at ¶ 3.  Even if it is true that the Plaintiff introduced this position in the 1996 Action, it was not elaborated on in any manner.  The Plaintiff then chose not to raise such argument in the subsequent state court litigation when it challenged the Lease termination.  Instead, the Plaintiff raised nine affirmative defenses, none of which contended that the Plaintiff held an ownership interest in the Premises.  Nor did the Plaintiff make an assertion of an ownership interest at any point during the extensive appellate process in which it faced eviction.  The Court is not persuaded by the Plaintiff's suggestion that such an argument was inappropriate in the state court context.  ECF No. 116 at 22:2–24:18.  The Plaintiff cannot pick and choose when to assert its alleged ownership interest in the Premises.

Further, the Plaintiff quotes the affidavit of Defendant 542 Holding's then-treasurer and references a memorandum of law submitted by Defendant 542 Holding to show that Defendant

---

[9] The Court notes that these exhibits were put forth in attempt to establish "notice" and defeat Defendant 60G's bona fide purchaser defense.  Although the Court does not reach the bona fide purchaser issue, it chooses to address the statements made by the parties in these prior filings in further support of why the Lease should not be recharacterized.

542 Holding agreed that Prince's interest in the Premises was akin to ownership.  ECF No. 105, Exs. V, W.  The Plaintiff also quotes another memorandum of law submitted by Defendant 542 Holding which stated that "[t]he lease in question is not typical of standard commercial leases" and that the "199-year lease effectively grants Plaintiffs an ownership interest in the premises similar to that of shareholders," thereby binding the Plaintiff to "the same rules as other proprietary lessees in the building and . . . the business judgment rule."  ECF No. 105, Ex. X.  When these exhibits are read as a whole, however, it is apparent that Defendant 542 Holding was merely addressing the Plaintiff's references to an ownership interest in order to make a fulsome argument. Such statements should not be interpreted as admissions by Defendant 542 Holding of the Plaintiff's alleged ownership interest in the Premises, and the Court does not rely on these statements in its recharacterization analysis.

Finally, Defendant 60G points out that the Plaintiff held itself out in other state court filings as a tenant with a leasehold interest in the Premises.  ECF No. 97 at 11–12 (citing to the 2002 Action, the Yellowstone Action, the Second Yellowstone Action, the Holdover Proceeding, and sublease with Steve Madden).  Now, the Plaintiff asks the Court to find nearly the opposite and declare that Prince has an enforceable ownership interest in the Premises.  Such inconsistencies displayed by the Plaintiff further dissuade the Court from recharacterizing the Lease as an ownership interest.

## V.    CONCLUSION

The Court denies the Plaintiff's Motion and grants the Defendants' Motions.  Counsel for the Defendants shall submit a proposed form of order to the Court consistent with the findings in this Memorandum Opinion.  Counsel for the Plaintiff must be given the opportunity to comment on the proposed form of order before it is submitted to the Court.

Dated: July 23, 2024
New York, New York

*/s/ Lisa G. Beckerman*
HONORABLE LISA G. BECKERMAN
UNITED STATES BANKRUPTCY JUDGE